**Case No. 26-30021**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

**SEACOR MARINE, L.L.C.,**

Plaintiff – Appellant

**v.**

**GOL, L.LC.,**

Defendant – Appellee

---

On Appeal from the United States District Court
for the Eastern District of Louisiana, Case No. 2:24-CV-2409
The Honorable Sarah S. Vance, Presiding

---

# ORIGINAL BRIEF OF APPELLANT SEACOR MARINE, L.L.C.

---

Arthur R. Kraatz (Bar #35194)
Gary A. Hemphill (Bar #6768)
Jeremy T. Grabill (Bar #34924)
PHELPS DUNBAR LLP
Canal Place | 365 Canal Street, Suite 2000
New Orleans, Louisiana 70130
Telephone: 504 566 1311
Facsimile: 504 568 9130
Email: arthur.kraatz@phelps.com
gary.hemphill@phelps.com
jeremy.grabill@phelps.com

## CERTIFICATE OF INTERESTED PARTIES

Pursuant to Fifth Circuit Rule 28.2.1, the undersigned counsel of record certifies that the following listed persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. SEACOR Marine, L.L.C.

2. Arthur R. Kraatz, Gary A. Hemphill, Jeremy T. Grabill and the law firm of Phelps Dunbar LLP, counsel for SEACOR Marine, L.L.C.

3. GOL, L.L.C.

4. Kyle Khoury, Arron Greenbaum, and the law firm of Pusateri, Johnston, Guillot & Greenbaum, LLC, counsel for GOL, L.L.C.

5. Thomas M. Flanagan, Anders Holmgren, and the law firm of Flanagan Partners, LLP, counsel for GOL, L.L.C.

SO CERTIFIED, this 18th day of March, 2026.

*/s/ Arthur R. Kraatz*
Arthur R. Kraatz
ATTORNEY FOR APPELLANT
SEACOR MARINE, L.L.C.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant SEACOR Marine, L.L.C. respectfully requests oral argument. Oral argument will be useful to the Court in light of the factual record and the legal issues presented in this appeal, particularly considering that two different district judges in the Eastern District of Louisiana reached opposite conclusions on essentially the same issues involved in this case, calling into question the District Court's dismissal of SEACOR's claims in this case.

# TABLE OF CONTENTS

**CERTIFICATE OF INTERESTED PARTIES** .......... **i**

**STATEMENT REGARDING ORAL ARGUMENT** .......... **ii**

**TABLE OF CONTENTS** .......... **iii**

**TABLE OF AUTHORITIES** .......... **v**

**STATEMENT OF JURISDICTION** .......... **1**

**STATEMENT OF THE ISSUE** .......... **2**

**STATEMENT OF THE CASE** .......... **2**

**I. Factual Background** .......... **6**

*A. The Parties and the Brokerage Agreement* .......... 6

*B. The Cox Charter and Unpaid Invoices* .......... 7

*C. Cox's Bankruptcy and the Trade Agreement* .......... 8

**II. The *SEACOR v. GOL* Litigation** .......... **10**

*A. The District Court's Summary Judgment Ruling* .......... 15

*B. SEACOR's Motion for Reconsideration* .......... 18

**III. The *R&R v. GOL* Litigation** .......... **19**

**SUMMARY OF THE ARGUMENT** .......... **22**

**STANDARD OF REVIEW** .......... **23**

**ARGUMENT** .......... **25**

**I. GOL Received Payment on SEACOR's Invoices** .......... **25**

**II. GOL Was Permitted to Allocate the Trade Agreement Payment to SEACOR's Invoices** .......... **28**

**III. GOL's Failure to Allocate the Trade Agreement Payment Breached its Fiduciary Duties to SEACOR** .......... **36**

**IV. The R&R Verdict Further Underscores this Result ........................41**

**CONCLUSION.........................................................................................42**

**CERTIFICATE OF SERVICE ......................................................................44**

**CERTIFICATE OF COMPLIANCE ................................................................45**

# TABLE OF AUTHORITIES

## Cases

*Ala. Farm Bureau Mut. Cas. Co. v. Am. Fid. Life Ins. Co.*,
606 F.2d 602 (5th Cir. 1979) ....................24

*Brown v. Slenker*,
220 F.3d 411 (5th Cir. 2000) ....................40

*Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*,
530 F.3d 395 (5th Cir. 2008) ....................24

*Heinsohn v. Carabin & Shaw, P.C.*,
832 F.3d 224 (5th Cir. 2016) ....................25

*In re MLCJR, et al.*,
No. 23-90324 (Bankr. S.D. Tex. filed May 14, 2023)....................8

*Johnson v. GlobalSantaFe Offshore Servs., Inc.*,
799 F.3d 317 (5th Cir. 2015) ....................39

*Martin v. John W. Stone Oil Distrib., Inc.*,
819 F.2d 547 (5th Cir. 1987) ....................42

*Meridian Automotive Systems-Composites Operations, Inc.*, 372 B.R.
710 (D. Del. Aug. 23, 2007) ....................28

*Offshore Liftboats, LLC v. GOL, LLC*,
No. 2:24-cv-1632 (E.D. La. filed June 26, 2024)....................5

*R & R Boats, et al. v. GOL, LLC*,
No. 25-3872 (S.D. Tex. filed October 14, 2025)....................18

*R & R Boats, Inc. v. GOL, LLC*,
No. 24-1875, 2025 WL 3687297 (E.D. La. Dec. 19, 2025).................... 19, 20

*R & R Boats, Inc. v. GOL, LLC*,
No. 24-1875, 2026 WL 352786 (E.D. La. Feb. 9, 2026) .................... passim

*Rogers v. Bromac Title Servs., L.L.C.*,
755 F.3d 347 (5th Cir. 2014) ....................23

*Tolan v. Cotton*,
572 U.S. 650 (2014)......24

*Turner v. Baylor Richardson Med. Ctr.*,
476 F.3d 337 (5th Cir. 2007)......24

*United States v. State Farm Fire & Cas. Co.*,
2016 WL 3034326 (S.D. Miss. May 27, 2016)......40

*Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*,
920 F.3d 958 (5th Cir. 2019)......24

**Statutes**

11 U.S.C. § 503(b)(9)......26

**Other Authorities**

Restatement (Second) of Agency (1958)......39

## STATEMENT OF JURISDICTION

***The District Court's Jurisdiction***: This lawsuit involves claims arising out of the breach of a maritime contract and the breach of fiduciary duties created by a maritime contract. Accordingly, the District Court had jurisdiction pursuant to 28 U.S.C. § 1333.

***This Court's Jurisdiction***: This Court's jurisdiction is based upon 28 U.S.C. § 1291, which provides for jurisdiction over appeals from a final decision of a district court, because the District Court entered final judgment dismissing SEACOR's claims with prejudice.

***This Appeal is Timely***: This appeal is from the District Court's final judgment entered on September 17, 2025.[1] Appellant SEACOR Marine, L.L.C. ("SEACOR") filed a timely motion seeking reconsideration pursuant to Federal Rule of Civil Procedure 59(e) on October 14, 2025.[2] The District Court entered its order denying Rule 59 relief on December 15, 2025.[3] SEACOR filed its notice of appeal on January 9, 2026.[4] This appeal is timely. Fed. R. App. P. 4(a)(1)(A).

[1] ROA.985.

[2] ROA.986.

[3] ROA.1054.

[4] ROA.1061.

## STATEMENT OF THE ISSUE

Whether the District Court erred in awarding summary judgment to GOL and denying summary judgment to SEACOR, where GOL breached its contractual and fiduciary duties to SEACOR by converting funds rightfully due and payable to SEACOR and instead unjustly enriching GOL and its affiliates.

## STATEMENT OF THE CASE

This appeal arises from a commercial maritime dispute between Appellant SEACOR Marine, L.L.C. ("SEACOR") and Appellee GOL, L.L.C. ("GOL"). The District Court wrongly dismissed SEACOR's claims on summary judgment. Highlighting the District Court's error, another district judge recently reached the opposition conclusion and awarded a similarly situated plaintiff over $1.4 million on essentially identical claims against GOL. This Court should reverse the District Court's dismissal of SEACOR's claims, hold that GOL plainly breached its contractual and fiduciary obligations to SEACOR, and remand for a trial on damages.

SEACOR owns and operates marine vessels that provide various services to the offshore oil and gas industry. SEACOR and GOL entered into a Brokerage Agreement, under which GOL agreed to serve as SEACOR's fiduciary and agent for

the purpose of brokering vessel charters with third parties.[5] In 2022, GOL presented SEACOR with an offer to charter two of SEACOR's vessels to Cox Operating, LLC ("Cox"). SEACOR agreed, and the two vessels provided services to Cox from September through December 2022. Pursuant to their course of dealing, SEACOR invoiced GOL approximately $2.7 million for those services, and GOL in turn invoiced Cox for the amount of SEACOR's invoices, plus GOL's brokerage fee.[6]

Cox, however, failed to pay and eventually filed for bankruptcy in the Southern District of Texas. At the time of Cox's bankruptcy, it owed approximately $24.8 million to GOL for various vessels (including SEACOR's) that GOL had brokered for Cox. As part of the bankruptcy proceedings, GOL negotiated a "critical vendor" deal with Cox and entered into a secret Trade Agreement whereby Cox paid GOL $13 million—approximately 52% of GOL's prepetition claim—in exchange for GOL's agreement to continue providing vessel brokerage services to the bankruptcy estate.[7]

---

[5] ROA.277 (SEACOR-GOL Brokerage Agreement).

[6] *See* ROA.288-293 (SEACOR's invoices to GOL); ROA.305-308; ROA.319-320 (GOL's invoices to Cox). SEACOR's invoices to GOL total $2,701,234.16 and GOL's associated invoices to Cox total $2,793,004.48. The difference ($91,770.32) represents GOL's brokerage fee with respect to the SEACOR invoices.

[7] ROA.538 (Cox-GOL Trade Agreement). GOL went to significant lengths to keep the Trade Agreement secret. SEACOR only obtained it by serving formal discovery on the Cox bankruptcy trustee. Even after the bankruptcy trustee produced the Trade Agreement to SEACOR (without objection and without any request for confidentiality), GOL objected to SEACOR's possession of the Trade Agreement and characterized SEACOR's possession as somehow nefarious. ROA.71 (objecting to discovery based on the position that SEACOR's possession of

Contrary to the District Court's holding below, the Trade Agreement *required* GOL to apply the $13 million payment to the invoices comprising GOL's prepetition claim, and GOL's fiduciary duties to SEACOR under their separate Brokerage Agreement *required* GOL to treat SEACOR fairly in doing so. Instead, in violation of both agreements, GOL directed most of the $13 million to affiliated companies owned by the same three individuals that own GOL. GOL paid two of its affiliates significantly more than they were owed, loaned a third affiliate nearly $500,000 despite that affiliate *being owed nothing* by the Cox estate, and *kept for itself* approximately $1.6 million of the payment from Cox. This conduct was a plain and obvious breach of GOL's contractual and fiduciary obligations to SEACOR.

The District Court erred in granting summary judgment to GOL and denying summary judgment to SEACOR by reading into the Trade Agreement—to which SEACOR was not a party—an implied prohibition that excused GOL from its separate and independent contractual and fiduciary obligations to SEACOR under their Brokerage Agreement. The District Court's interpretation is unsupported by

the Trade Agreement was "unauthorized"). Then, despite the fact that GOL never produced the Trade Agreement in discovery in this case, GOL attempted to argue that it was somehow protected from public disclosure by virtue of the protective order in this case, notwithstanding the fact that SEACOR received it from another source before this litigation commenced. *See* ROA.646 at n.2. Notwithstanding this maneuvering, GOL never filed a motion to seal the Trade Agreement and never filed any motion alleging that SEACOR violated the protective order in this case—likely because such motions would have been meritless. In hindsight, GOL's efforts to keep the Trade Agreement secret speak volumes.

the text of the Trade Agreement, is not compelled by any identifiable provision of bankruptcy law, conflicts with GOL's own conduct, and produces a profoundly inequitable result that insulates GOL's brazen self-dealing from judicial scrutiny. This outcome is particularly troublesome here given that the District Court was sitting in admiralty as a court of equity.

Notably, SEACOR was not the only innocent vessel owner damaged by GOL's misconduct. Another vessel owner, R&R Boats, Inc. ("R&R"), filed its own lawsuit against GOL asserting essentially the same claims as SEACOR.[8] SEACOR's lawsuit and R&R's lawsuit are factually and legally indistinguishable.[9] SEACOR's suit was assigned to Judge Vance, while R&R's suit was assigned to Judge Fallon. Notwithstanding Judge Vance's ruling in this case, in the R&R suit Judge Fallon *denied* summary judgment to GOL and proceeded to a bench trial where he held that GOL's conduct amounted to a breach of its duties under the R&R brokerage agreement and a "willful breach" of GOL's duty of good faith. *R & R Boats, Inc. v. GOL, LLC*, No. 24-1875, 2026 WL 352786, at *6 (E.D. La. Feb. 9, 2026). On this basis, Judge Fallon awarded R&R $1.43 million, plus interest, costs, and attorneys' fees. *Id*.

---

[8] *R & R Boats, Inc. v. GOL, LLC,* No. 24-1875 (E.D. La. filed July 26, 2024).

[9] A third identically situated vessel owner, Offshore Liftboats, LLC, also sued GOL. *Offshore Liftboats, LLC v. GOL, LLC,* No. 2:24-cv-1632 (E.D. La. filed June 26, 2024). That third lawsuit has been stayed pending the outcome of this appeal. *Id*. at Rec. Doc. 52.

In short, Judge Fallon reached the correct result. Even if there is any arguable doubt on this point, the fact that two different district judges reached opposite conclusions demonstrates, at a minimum, that summary judgment was inappropriate. This Court should reverse the District Court's summary judgment ruling, hold that GOL breached its contractual and fiduciary duties to SEACOR, and remand this matter for trial to determine an appropriate damages award to SEACOR.

## I. Factual Background

### *A. The Parties and the Brokerage Agreement*

SEACOR owns and operates marine vessels that provide various services to the offshore oil and gas industry. GOL acts as a vessel broker. Essentially, GOL connects vessel owners with GOL's clients—oil and gas operators in need of vessel services. GOL brokers vessels owned by independent third parties, like SEACOR, and also vessels owned by GOL's commonly owned affiliates. GOL does not itself own or operate any vessels.

GOL and SEACOR entered into a Brokerage Agreement.[10] Under that Agreement, GOL agreed to serve as SEACOR's agent for the purpose of brokering vessel charters. The Brokerage Agreement could not be clearer in establishing this agency relationship: "Operator [SEACOR] hereby appoints Broker [GOL] as

[10] ROA.277.

Operator's agent solely for the purpose of obtaining charters for Operator's vessels."[11]

The Brokerage Agreement permitted GOL to obtain charters for SEACOR's vessels, subject to SEACOR's consent. The Brokerage Agreement imposed two distinct duties on GOL. First, GOL was required to "remit net charter hire (charter hire less Broker's fee) to Operator [SEACOR] within fifteen (15) business days after receipt of such charter hire from the Charterer."[12] Second, while the Brokerage Agreement provided that GOL was not directly liable for any charterer's nonpayment of charter hire, it explicitly obligated GOL to "undertake all reasonable efforts to collect charter hire from the Charterer."[13] As detailed below, under maritime law, GOL was SEACOR's fiduciary within the scope of its agency, which means that GOL owed SEACOR a heightened fiduciary duty of care with respect to GOL's obligation to the collection of charter hire. SEACOR's claims in this case all arise from GOL's flagrant disregard of its fiduciary duty to SEACOR.

### *B. The Cox Charter and Unpaid Invoices*

In the fall of 2022, GOL brokered the charter of two of SEACOR's vessels to Cox. Pursuant to their course of dealing, SEACOR invoiced GOL for those services,

---

[11] ROA.277.

[12] ROA.278.

[13] ROA.278.

and GOL, in turn, invoiced Cox for the amount of SEACOR's invoices, plus GOL's brokerage fee.[14] SEACOR's invoices, which totaled approximately $2.7 million, went unpaid.

### *C. Cox's Bankruptcy and the Trade Agreement*

In May 2023, Cox and several of its affiliates filed for bankruptcy protection in the United States Bankruptcy Court for the Southern District of Texas.[15] At the time of Cox's bankruptcy filing, Cox owed GOL approximately $24.8 million ("GOL's Prepetition Claim").[16] Critically, GOL's Prepetition Claim included the $2.7 million that SEACOR had invoiced to GOL, as well as amounts for services provided by other third-party vessel owners and by GOL's affiliates.[17] Thus, GOL expressly relied on SEACOR's invoices to enhance the amount of its claim against Cox.[18]

---

[14] *See* ROA.288-293 (SEACOR's invoices to GOL); ROA.305-308; ROA.319-320 (GOL's invoices to Cox). SEACOR's invoices to GOL total $2,701,234.16 and GOL's invoices to Cox total $2,793,004.48. The difference ($91,770.32) represents GOL's brokerage fee with respect to the SEACOR invoices.

[15] *In re MLCJR, et al.*, No. 23-90324 (Bankr. S.D. Tex. filed May 14, 2023).

[16] *See* ROA.538.

[17] ROA.511.

[18] ROA.295 (GOL's Notice of Perfection, Continuation, or Maintenance of Liens against Cox, attached as Exhibit C to GOL's Motion for Summary Judgment).

Shortly after Cox filed bankruptcy, Cox and GOL entered into the Trade Agreement.[19] Under the Trade Agreement, in exchange for GOL's continued provision of post-bankruptcy brokerage services to Cox, Cox agreed to pay GOL $13 million toward GOL's Prepetition Claim of $24.8 million. The Trade Agreement explicitly recited that Cox was paying $13 million "towards GOL's Prepetition Claim"—a claim that indisputably included SEACOR's invoices.[20] Paragraph 4 of the Trade Agreement addressed how the Payment Amount was to be applied, directing that the funds be applied, among other things, "to any amount secured by a lien."[21] GOL expressly admitted in its corporate deposition that SEACOR's invoices fall within the category of "amount[s] secured by a lien."[22]

Despite this clear language and admission, GOL paid SEACOR nothing from the $13 million Trade Agreement payment. Instead, as discovery would eventually reveal, GOL paid and/or loaned most of those funds directly to itself and companies

[19] ROA.538.

[20] ROA.538.

[21] ROA.539. "Payment Amount" is a defined term in the Trade Agreement and refers to the $13 million that GOL received from Cox. References to the "Payment Amount" in this brief refer to the same thing.

[22] ROA.510-511. To be clear, and contrary to the District Court's apparent assumption, the Trade Agreement did not require any vessel owners to continue providing services to GOL or the Cox bankruptcy estate to be entitled to payment—rather, the $13 million payment was made to GOL as a "critical vendor" and only GOL was obligated to continue providing services to the bankruptcy estate.

under its common ownership, while leaving SEACOR (and other vessel owners) with nothing.

## II. The *SEACOR v. GOL* Litigation

SEACOR filed this lawsuit to recover the funds misappropriated by its fiduciary and damages for GOL's breach of its fiduciary duties. SEACOR's suit invoked admiralty jurisdiction under 28 U.S.C. § 1333 and was assigned to Judge Vance of the United States District Court for the Eastern District of Louisiana.[23]

GOL's efforts to conceal its misappropriation of the $13 million payment from Cox continued into this litigation. From the very commencement of discovery, GOL displayed a persistent disregard for its discovery obligations. Only after the District Court forced GOL to participate in discovery did SEACOR learn why GOL had gone to such lengths to conceal the facts related to the Trade Agreement.[24] Stated simply, it became clear that GOL relied on SEACOR's invoices (and the invoices of other vessel owners) to increase the amount of its Prepetition Claim against Cox, but when payment was made by Cox, GOL kept nearly all of that payment for itself and its affiliates, to the detriment of the vessel owners that actual performed the work.

[23] ROA.9.

[24] *See* ROA.48 (motion to compel written discovery from GOL); ROA.162 (SEACOR's motion for Rule 37(d) relief based on GOL's refusal to appear for deposition); *see also* ROA.165-169 (outlining GOL's discovery misconduct).

To understand the incredible scope of the impropriety of GOL's conduct, it is important to understand the corporate structure of the relevant entities. GOL is owned by three individuals: Ronald ("Rec") Chaddock owns 50%; Joel Broussard owns 40%; and Todd Danos owns 10%.[25] The three owners individually also own, in varying proportions, several affiliated companies.[26] Chaddock owns 100% of REC Marine Logistics, LLC ("REC Marine").[27] REC Marine and GOL share office space and GOL employees often provide operational support to REC Marine.[28] At the times relevant to this dispute, Chaddock was president of GOL (in addition to being the sole owner of REC Marine).[29] Chaddock and Broussard are each 50% owners in another company, RO Boats, LLC ("RO Boats").[30] RO Boats also shares office space with GOL, and they share the same general counsel.[31] Danos separately owns 100% of Lafourche Tugs, Inc. ("Lafourche Tugs").[32] Like RO Boats and REC Marine, Lafourche Tugs shares office space with GOL.[33]

---

[25] ROA.501.

[26] ROA.503.

[27] ROA.517.

[28] ROA.517-519.

[29] ROA.521.

[30] ROA.530.

[31] ROA.532-533.

[32] ROA.184.

[33] ROA.528.

GOL distributed the $13 million Trade Agreement payment as follows:

- REC Marine received $7,800,000, which was $1,509,576.89 more than REC Marine's portion of the Prepetition Claim ($6,290,423.11), and $5,000,000 of which was characterized as a "loan."[34]

- Lafourche Tugs was paid $275,000 against invoices totaling $291,876 and also received a "loan" from GOL in the amount of $463,288.[35] Thus, Lafourche Tugs ultimately received more than 250% of its portion of the Prepetition Claim.

- RO Boats received a "loan" of $495,000 from GOL out of the Cox payment.[36] Remarkably, RO Boats provided no services whatsoever to Cox, either pre- or post-petition and therefore had no rights whatsoever to share in the Cox payment.[37] This "loan" was not documented by any promissory note, had no specific terms, has not been repaid, and there is no concrete plan to repay the loan.[38] It is thus a "loan" in name only; in reality it was a brazen conversion of funds due to SEACOR and others.

- In addition to its payments to affiliates, GOL did distribute a small portion of the Trade Agreement payment to two third party vessel owners. Third-party vessel owners EBI Liftboats, LLC and Barry Graham Oil Service, LLC were each paid 42% of their respective portions of the Prepetition Claim (even though GOL received 52% of the Prepetition Claim from Cox), a combined total of $2,323,243.42.[39]

- Approximately $1.6 million of the Trade Agreement payment is unaccounted for and cannot be traced to any recipient based on the records produced by

---

[34] ROA.565.

[35] ROA.565.

[36] ROA.563.

[37] ROA.530.

[38] ROA.533-534.

[39] ROA.546.

GOL.[40] GOL's corporate representative testified that he did not know what happened to these funds or whether they were still in GOL's possession.[41] GOL later clarified that it retained these amounts for itself.[42]

The below chart summarizes GOL's use of the Trade Agreement payment from Cox in relation to the Prepetition Claims of the entities it paid:

| **Payee** | **Prepetition Claim** | **Paid Amount** |
|---|---|---|
| Rec Marine[43] | $6,290,423.11 | $7,800,000.00<br>($5 million as a loan) |
| Lafourche Tugs[44] | $291,876.00 | $738,288.00<br>($463,288 as a loan) |
| RO Boats[45] | $0.00 | $495,000.00 (as a loan) |
| Barry Graham[46] | $2,338,085.47 | $981,995.90 |
| EBI[47] | $3,359,778.79 | $1,341,247.52 |
| **TOTAL PAID** | | **$11,356,531.42** |
| **RETAINED BY GOL** | $520,000.00[48] | **$1,643,468.58** |

[40] ROA.556.

[41] ROA.882-884.

[42] ROA.728.

[43] ROA.557-558.

[44] ROA.565.

[45] ROA.563.

[46] ROA.559.

[47] ROA.560.

[48] Calculated at 4% of the $13 million payment based on GOL's corporate deposition testimony that its brokerage fee was generally in that range.

One of the most remarkable aspects of GOL's use of the Trade Agreement funds is the "loans" it made using the funds. Despite the Trade Agreement explicitly obligating GOL to apply the Payment Amount to the Prepetition Claim, GOL "loaned" most of the Payment Amount to its affiliates. Of the $7.8 million GOL distributed to REC Marine, $5 million was a "loan" from GOL.[49] GOL's corporate representative had no knowledge of whether that loan was documented, what the terms of the loan were, or whether there was any intention that the loan be imminently repaid.[50]

In addition to the $5 million loan to REC Marine, GOL "loaned" $463,288 to Lafourche tugs[51] and an additional $495,000 to RO Boats.[52] Like the "loan" to REC Marine, those transactions are undocumented. Remarkably, GOL's corporate representative (who serves as the general counsel of both GOL and RO Boats), testified that the loan between those two companies occurred without his

[49] ROA.523.

[50] ROA.524.

[51] ROA.562.

[52] ROA.563.

knowledge.[53] On top of these "loans," there is an additional $1.6 million of the Trade Agreement Payment that GOL kept for itself.[54]

Thus, of the $13 million Payment Amount, GOL "loaned" or retained for itself $7,558,288—well more than half of the payment—despite express provisions of the Trade Agreement requiring that the Payment Amount be applied to the Prepetition Claim.

### *A. The District Court's Summary Judgment Ruling*

On June 24, 2025, GOL moved for summary judgment, asserting two arguments.[55] First, it argued that a "pay-if-paid" clause in the Brokerage Agreement precluded SEACOR's claims. Second, it argued that GOL was legally prohibited from disbursing any of the Trade Agreement proceeds to SEACOR because SEACOR did not provide post-petition services to the Cox bankruptcy estate.

In its opposition, SEACOR pointed out that the "pay-if-paid" issue was a red herring.[56] SEACOR has never argued that GOL has an obligation to pay SEACOR's invoices in the first instance. Rather, GOL has two distinct obligations under the Brokerage Agreement: (1) to undertake all reasonable efforts to collect charter hire

---

[53] ROA.534-535.

[54] ROA.556; ROA.882-884.

[55] ROA.264.

[56] ROA.489.

from the charterer, and (2) to promptly remit to SEACOR any funds collected that were attributable to SEACOR's invoices.[57] SEACOR's claim is based on GOL's obvious breach of these two obligations: GOL was paid $13 million (about 52% of the Prepetition Claim) based in part on SEACOR's invoices but declined to share any portion of that sum with SEACOR.[58] It is equally obvious that GOL's argument that it was prohibited from paying any of the Trade Agreement funds to SEACOR is totally groundless. Neither the single case cited by GOL nor any provision of the Trade Agreement or any provision of bankruptcy law supports the argument.[59] For these reasons, and based entirely on undisputed evidence, SEACOR argued that summary judgment should not only be denied to GOL, but that the court should grant summary judgment in favor of SEACOR pursuant to Federal Rule of Civil Procedure 56(f).

Despite the clear evidence of GOL's breach of its fiduciary duties and misappropriation of funds, on September 16, 2025, the District Court granted GOL's motion for summary judgment and dismissed SEACOR's claims with prejudice.[60] The court erroneously held that SEACOR was not entitled to any portion of the $13

[57] ROA.489.

[58] ROA.489.

[59] ROA.490-494.

[60] ROA.952.

million Trade Agreement payment because SEACOR had not agreed to provide post-petition services to Cox. In reaching this conclusion, the Court acknowledged that neither the Trade Agreement nor the Bankruptcy Court's orders contained any explicit provision that would have prohibited GOL from paying SEACOR out of the Trade Agreement Payment. Nevertheless, the Court concluded that such a prohibition was implied by the logic and spirit of the Trade Agreement and the general purpose of critical vendor arrangements in bankruptcy.

Critically, the District Court's interpretation does not account for the undisputed fact that GOL itself behaved as if no such prohibition existed. GOL distributed a substantial portion of the critical vendor funds to RO Boats—an affiliate that provided neither pre-petition nor post-petition services to Cox—and overpaid its other affiliates well above their respective portions of the Prepetition Claim. This conduct (which GOL has never attempted to explain or justify) is irreconcilably inconsistent with GOL's argument (and the District Court's finding) that GOL was prohibited from paying SEACOR, and it fundamentally undermines the District Court's interpretation of the Trade Agreement.

### B. *SEACOR's Motion for Reconsideration*

On October 14, 2025, SEACOR timely moved for reconsideration pursuant to Federal Rule of Civil Procedure 59(e).[61] SEACOR argued that the District Court's interpretation of the Trade Agreement was legal error and led to an extremely inequitable result, whereby GOL's misuse of the Payment Amount was insulated and SEACOR was denied any remedy against GOL. In the alternative, in the event that the District Court persisted in its refusal to allocate the Trade Agreement payment, SEACOR requested that the District Court hold the reconsideration motion in abeyance pending the outcome of a separate adversary complaint filed by SEACOR and other similarly situated vessel owners against GOL in the Cox bankruptcy proceedings, which asked the Bankruptcy Court to allocate the critical vendor funds that Cox had paid to GOL.[62]

On December 15, 2025, the District Court denied SEACOR's motion for reconsideration.[63] This appeal followed.

---

[61] ROA.986.

[62] ROA.997 (Adversary Complaint filed by R&R Boats, Offshore Liftboats, and SEACOR against GOL). In the adversary complaint, SEACOR and its co-plaintiffs asked the Bankruptcy Court to issue a declaratory judgment allocating the Trade Agreement payment among the invoices comprising GOL's Prepetition Claim. Despite initially arguing to the District Court in this case that the Bankruptcy Court was the proper forum to raise any concerns with respect to GOL's distribution of the Trade Agreement payment (ROA.274 at n.32), GOL moved to dismiss the adversary complaint for lack of jurisdiction. *R & R Boats, et al. v. GOL, LLC*, No. 25-3872 (S.D. Tex. filed October 14, 2025), Rec. Doc. 9. The adversary proceeding remains pending in the Bankruptcy Court.

[63] ROA.1054.

### III. The *R&R v. GOL* Litigation

As noted above, SEACOR is not the only vessel owner that was mistreated by GOL. Another vessel owner, R&R, filed its own lawsuit against GOL, asserting essentially the same claims.[64] SEACOR's lawsuit and R&R's lawsuit are factually and legally indistinguishable, but the R&R lawsuit was assigned to a different district judge (Judge Fallon).

Like SEACOR, R&R had a brokerage agreement with GOL. *R & R Boats, Inc. v. GOL, LLC*, No. 24-1875, 2025 WL 3687297, at *1 (E.D. La. Dec. 19, 2025). As GOL did with SEACOR, GOL concealed the Trade Agreement from R&R and then, despite relying on R&R's invoices to support its $24.8 million Prepetition Claim against Cox, GOL paid R&R nothing out of the $13 million Cox payment.

After GOL obtained the summary judgment ruling from Judge Vance dismissing SEACOR's claims, GOL moved for summary judgment against R&R. Judge Fallon, however, denied that motion, finding that genuine disputes of material fact existed with respect to whether GOL had breached its duties to R&R. In reaching that conclusion, Judge Fallon specifically recognized that "the scope of GOL's duties to SEACOR and responsibilities with regard to obtaining payment on SEACOR's behalf as laid out in those sections of the respective brokerage

[64] *R & R Boats, Inc. v. GOL, LLC*, No. 24-1875 (E.D. La. filed July 26, 2024).

agreements are identical to GOL's duties and responsibilities to R&R." *Id*. at *4. Nonetheless, the R&R court denied summary judgment to GOL.

The R&R claim then proceeded to trial. After trial, Judge Fallon issued his Findings of Fact and Conclusions of Law. *R & R Boats, Inc. v. GOL, LLC*, No. 24-1875, 2026 WL 352786 (E.D. La. Feb. 9, 2026). Judge Fallon quotes the R&R brokerage agreement four times in his written ruling. Each quotation is substantively identical to the language in the SEACOR Brokerage Agreement. In fact, with a single irrelevant exception, the language in the two agreements is, word-for-word, identical:

- Judge Fallon states that "[t]he [R&R] Agreement provides, 'Operator hereby appoints Broker as Operator's agent for obtaining charters for Operator's vessels.' Under the Agreement, once R&R Boats orally accepted a job, '[GOL] was authorized...to sign, as agent on behalf of Operator, a Charter, Work Order or similar agreement, should same be required by the Charterer.'" *R & R Boats*, 2026 WL 352786, at *2.
    - Similarly, the SEACOR Brokerage Agreement provides, "Operator appoints Broker as Operator's agent solely for the purpose of obtaining charters for Operator's vessels."[65] Under the Agreement, once SEACOR orally accepted a job, "[GOL] is hereby authorized by Operator to sign, as agent on behalf of Operator, a Charter, Work Order or other similar agreement, should same be required by the Charterer."[66]

---

[65] ROA.277. Here, we find the single difference between the R&R and SEACOR Brokerage Agreements. The SEACOR agreement states that GOL is SEACOR's agent "solely" for the purpose of obtaining vessel charters whereas the R&R agreement does not contain the word solely. Since both cases pertain exclusively to GOL's agency with respect to obtaining vessel charters, this minor distinction is irrelevant.

[66] ROA.277.

- Judge Fallon recites that "[t]he [R&R] Agreement contemplates that, post-charter, GOL will invoice the charterer, obtain and remit payment to the principal (Operator) less a percentage as its brokerage fee. Under the Agreement, GOL agreed to 'Undertake all reasonable efforts to collect charter hire from the Charterer.'" *R & R Boats*, 2026 WL 352786, at *2.
  - The SEACOR Brokerage Agreement contains identical terms.[67]
- Judge Fallon's ruling notes that "[t]he [R&R] Agreement further provides GOL will 'remit net charter hire (charter hire less Broker's fee) to Operator within fifteen (15) business days after receipt of such charter hire from the Charterer.' The Agreement states it shall be 'governed, interpreted and controlled by the General Maritime Laws of the United States of America.'" *R & R Boats*, 2026 WL 352786, at *2.
  - The SEACOR Brokerage Agreement contains identical provisions.[68]
- Finally, Judge Fallon emphasized that "GOL's explicit duties under the [R&R] Agreement were to 'use reasonable efforts to obtain from the Charterer provisions for payment within a reasonable time' and 'undertake all reasonable efforts to collect charter hire from the Charterer.'" *R & R Boats*, 2026 WL 352786, at *2.
  - Again, the SEACOR Brokerage Agreement contains identical provisions.[69]

On the basis of these identical sets of obligations, Judge Fallon held that GOL's conduct amounted to a breach of its duties under the R&R brokerage

---

[67] ROA.278 at § 4.

[68] ROA.278; ROA.280.

[69] ROA.278.

agreement and a "willful breach" of GOL's duty of good faith. *R & R Boats*, 2026 WL 352786, at *6. Judge Fallon also held that GOL's conduct "violated its explicit duties under the Agreement to make all reasonable efforts to collect charter hire on R&R Boats' behalf and its implied duties to act loyally, faithfully, and with full disclosure as R&R Boats' collection agent." *Id*. On this basis, Judge Fallon awarded R&R $1.43 million, plus interest, costs, and attorneys' fees. *Id*.

Thus, despite having factually and legally identical claims, SEACOR's lawsuit against GOL was dismissed on summary judgment, while R&R received a substantial recovery after trial. This Court should correct that fundamental unfairness by reversing the District Court's summary judgment ruling in this case, hold that GOL breached its duties to SEACOR, and remand this matter for trial to determine an appropriate damages award to SEACOR.

## SUMMARY OF THE ARGUMENT

There are two fundamental questions on this appeal. The first is whether GOL received payment on some portion of SEACOR's invoices by virtue of the Trade Agreement payment from Cox. The second is whether GOL breached its fiduciary duties under the Brokerage Agreement to utilize "all reasonable efforts" to collect on SEACOR's invoices. The District Court combined both analyses into one when it erroneously determined that GOL was prohibited from applying any portion



PD.60942673.6

of the Trade Agreement Payment to SEACOR's invoices and, even if not prohibited, had no obligation to do so.

The District Court erred in combining the two analyses. It further erred in reading an implicit prohibition into the Trade Agreement despite the complete absence of any evidence that Cox or GOL understood the Trade Agreement that way. Finally, the District Court misapplied the law of fiduciary duty when it held that GOL had no obligation to apply the Trade Agreement Payment to SEACOR's invoices, even in part. Instead, the record demonstrates that GOL's conduct is an obvious breach of its contractual and fiduciary duties to SEACOR and this Court should reverse and render judgment in SEACOR's favor and remand for a trial on damages only. In any event, at an absolute minimum, there are genuine disputes of material fact on these points, such that this Court should reverse the District Court's summary judgment ruling and remand the matter for trial.

## STANDARD OF REVIEW

This Court reviews the District Court's summary judgment ruling *de novo*, applying the same standard as the District Court. *Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014).

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, the Court must "refrain from

making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008). In evaluating a motion for summary judgment, the court must resolve all ambiguities, draw all permissible inferences, and view the evidence in the light most favorable to the nonmoving party. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). In particular, the nonmoving party must "be given the benefit of all reasonable doubt in determining whether a genuine factual issue exists." *Ala. Farm Bureau Mut. Cas. Co. v. Am. Fid. Life Ins. Co.*, 606 F.2d 602, 609 (5th Cir. 1979) (citation omitted).

Here, the District Court failed to apply the correct summary judgment standard, instead weighing the competing evidence and resolving inferences in favor of GOL. *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (vacating a decision of this Court that it described as "reflect[ing] a clear misapprehension of summary judgment standards" because that decision "fail[ed] to credit evidence that contradicted some of its key factual conclusions," and "improperly weighed the evidence and resolved disputed issues in favor of the moving party") (cleaned up).

Since *Tolan*, this Court has emphasized these fundamental summary judgment principles, but the District Court here did not heed such teachings. *See, e.g.*, *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) ("On summary judgment the inferences to be drawn from the underlying facts contained

in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion. Credibility determinations have no place in summary judgment proceedings because non-movants' summary judgment evidence must be taken as true.") (cleaned up) (citations omitted); *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 245 (5th Cir. 2016) ("By choosing which testimony to credit and which to discard, a court improperly weighs the evidence and resolves disputed issues in favor of the moving party. Doing so is tantamount to making a credibility determination, and—at this summary judgment stage—a court may make no credibility determinations.") (cleaned up) (citations omitted).

## ARGUMENT

As outlined above, the Brokerage Agreement imposes (as relevant to this appeal) two separate fiduciary duties on GOL. The first is to timely remit to SEACOR any payments GOL receives from Cox for SEACOR's invoices. The second is to utilize all reasonable efforts to collect on SEACOR's invoices. GOL's breach of both duties is easy to demonstrate and the District Court erred in dismissing SEACOR's claims.

### I. GOL Received Payment on SEACOR's Invoices

GOL has consistently argued, and the District Court held, that GOL did not receive payment on SEACOR's invoices and thus had no obligation to pay SEACOR. That is simply incorrect and the plain text of the Trade Agreement

compels the opposite conclusion. The Trade Agreement recites that, at the time of its execution, Cox owed GOL approximately $24.8 million.[70] The Trade Agreement defines that debt as GOL's "Prepetition Claim."[71] GOL admits that the Prepetition Claim includes all of SEACOR's unpaid invoices.[72] The Trade Agreement recites that Cox paid $13 million "towards GOL's Prepetition Claim."[73] The Trade Agreement requires that the "Payment Amount *shall be applied* to the Prepetition Claim" in certain categories of priority.[74] There is no dispute that the first category of priority is inapplicable.[75] The second category is any amounts secured by a lien.[76] GOL agreed in its corporate deposition that all of SEACOR's invoices fall into this category.[77] GOL received no further allocation instructions from Cox.[78]

[70] ROA.538.

[71] ROA.538.

[72] ROA.511.

[73] ROA.538.

[74] ROA.539 (emphasis added).

[75] The first category relates to amounts entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9), which relates to good sold to the debtor in the ordinary course of business within 20 days of the petition date. Everyone agrees that this particular provision is not relevant to GOL.

[76] ROA.539.

[77] ROA.510-511.

[78] ROA.511-515.

Thus, it is indisputable that the Trade Agreement required that the $13 million payment be applied to GOL's Prepetition Claim and that the Prepetition Claim included SEACOR's invoices (among others). It is similarly undisputed that GOL did not comply with the allocation provisions of the Trade Agreement. Indeed, GOL did not apply the Trade Agreement payment to specific invoices comprising the Prepetition Claim. Instead, GOL distributed most of the Trade Agreement proceeds to its affiliates as "loans," in obvious violation of the Trade Agreement's allocation requirements. To date, GOL has offered no justification for its decision to divert millions of dollars from payment of the Prepetition Claim to itself and its commonly owned affiliates.[79] Indeed, despite this misappropriation being a central feature of SEACOR's claim, GOL made no attempt to explain or address this issue below.

The District Court gave this issue short shrift. In the District Court's view, it did not matter whether GOL applied the Trade Agreement payment properly, or to the Prepetition Claim at all, because there was no circumstance in which any portion of the Trade Agreement could have been allocated to SEACOR's invoices. The District Court believed that for two reasons. First, it concluded that GOL was prohibited from applying any portion of the Trade Agreement payment to

[79] It bears reminding that, at the time GOL loaned $5 million to REC Marine in plain violation of the Trade Agreement, Rec Chaddock was the president of GOL. ROA.521. He is also the sole owner of REC Marine. ROA.521.

SEACOR's invoices. Second, it concluded that, even if GOL was not prohibited from doing so, it had no obligation to apply the payment to SEACOR's invoices. As explained below, the District Court erred in both respects.

## II. GOL Was Permitted to Allocate the Trade Agreement Payment to SEACOR's Invoices

GOL argued that the law of critical vendor arrangements in bankruptcy prohibited it from allocating the Trade Agreement payment to SEACOR's invoices. In support of that argument, GOL cited a single case.[80] But, as SEACOR pointed out, that case says nothing about the situation present in this lawsuit.[81] Indeed, the District Court did not even mention this "authority" in its ruling.

The District Court charted a different course altogether. It held that "to the extent that the Trade Agreement does not explicitly state that GOL can apply the $13 million only to prepetition claims held by entities who agreed to continue to provide essential services at customary rates, the Agreement's aims, and the context of the Bankruptcy Order and Chapter 11 confirm this understanding."[82] The District Court all but acknowledged that no provision of the Trade Agreement contained this

[80] ROA.274 (citing *Meridian Automotive Systems-Composites Operations, Inc.*, 372 B.R. 710 (D. Del. Aug. 23, 2007)).

[81] *Meridian* involved a critical vendor who attempted to impose a 200% price increase on a debtor after executing a trade agreement with the debtor that required the vendor to maintain its prepetition terms post-petition. As is obvious, that is not relevant to any issue in this case.

[82] ROA.973.

limitation on allocation of the payment. It also implicitly acknowledged that no express order of the Bankruptcy Court constrained the manner in which GOL applied the Trade Agreement payment. Despite the lack of any express support in either bankruptcy law or the terms of the Trade Agreement, the Court said that "[t]o find that the Trade Agreement did not impose [such] limitations . . . would be illogical."[83]

But the District Court did not explain why it thought SEACOR's position was "illogical," and with due respect to the court below, reading the Trade Agreement in the way the District Court did vitiates its clear and express terms and, moreover, produces an extremely inequitable result. A brief explanation of the Bankruptcy Court's critical vendor program illustrates the flaw in the District Court's analysis. The Bankruptcy Court authorized Cox to pay certain prepetition debts to certain critical vendors in order to incentivize those vendors to provide essential services to the estate post-petition.[84] When it moved the Bankruptcy Court for permission to establish the program, Cox explicitly stated that it was seeking authorization to "pay at least a portion of the <u>prepetition amount due</u>" to critical vendors.[85]

The Bankruptcy Court granted Cox's request and it ordered that Cox was "authorized, but not directed, <u>to pay accrued and outstanding</u>" amounts owed to

---

[83] ROA.973.

[84] ROA.956.

[85] ROA.957 (emphasis added).

critical vendors.[86] The Bankruptcy Court also ordered that Cox was "authorized to require" that the critical vendors provide post-petition services on the same essential terms as were provided prepetition.[87] Finally, the Bankruptcy Court stated that Cox "*may*, in [its] sole discretion," seek to clawback payments made to any critical vendor that failed to continue providing post-petition services to the estate.[88]

Two important things are clear from the Bankruptcy Court's orders. First, Cox was only authorized to pay "accrued and outstanding" prepetition amounts owed to the critical vendors. Stated differently, Cox was only authorized to distribute funds for the purpose of paying down prepetition debts. Second, if a critical vendor ceased to provide services to the estate, Cox had the "sole discretion" with respect to what, if any, consequences to impose on the vendor.

Those provisions support SEACOR's arguments, not GOL's. SEACOR's fundamental position in this litigation is that GOL was required to apply the Trade Agreement payment to specific prepetition invoices. That is certainly consistent with the Trade Agreement (which explicitly requires as much) *and* the terms of the Bankruptcy Court's order, which only authorized Cox to pay "accrued and outstanding" prepetition debts. Moreover, there is clearly no absolute prohibition

[86] ROA.958 (emphasis added).

[87] ROA.958.

[88] ROA.958 (emphasis added).

on paying a vendor that ceases providing services to the estate because the order specifically contemplates that, if such a refusal occurs, Cox has the "sole discretion" to decide what, if any, consequences to seek for that refusal. Thus, nothing in either the "context" or "aims" of the Bankruptcy Court's order points toward the implicit prohibition found by the District Court.

In addition to lacking support in the text of the Trade Agreement and the Bankruptcy Court's order, GOL did not behave as if any implicit prohibition existed. According to the District Court, GOL was implicitly prohibited from distributing any of the critical vendor funds to a vessel owner that did not provide post-petition services to the estate. But, as noted above, GOL did just that when it "loaned" $495,000 to RO Boats—an entity that provided no post-petition services to the Cox estate. It is bizarre to conclude that GOL understood that such an implicit prohibition existed when GOL plainly and blatantly violated that prohibition.

Moreover, the implicit provision intuited by the District Court makes no sense in light of the nature of GOL's brokerage services prepetition. As noted above, GOL owns no vessels. When GOL provides brokerage services, it is acting as a sort of general contractor. It engages vessel owners to provide the services and then invoices Cox for the cost of those services, plus its markup. Thus, when Cox is paying a GOL invoice, GOL is only entitled to a small percentage commission

(usually in the range of 4%) of the payment, and GOL is obligated to pass the rest on to the vessel owner.

When Cox engaged GOL as a critical vendor, it engaged GOL to provide brokerage services. Notably, Cox did not directly engage any of the individual vessel owners as critical vendors, it only engaged GOL. Thus, no individual vessel owner was engaged by Cox as a critical vendor. This is yet another flaw in GOL's argument. GOL insists that it could only use the Cox payment to pay critical vendors, but ignores the fact that GOL was the only critical vendor at issue—not any individual vessel owner. *None* of the entities that GOL paid were retained by Cox as critical vendors. Instead, Cox retained GOL as a critical vendor and then relied on Cox to broker whatever vessels Cox required. In order to retain GOL, Cox agreed to pay $13 million to GOL in partial payment of GOL's Prepetition Claim. But, as outlined above, the vast majority of that Prepetition Claim (some 96%) was owed to the individual vessel owners that provided the services—not GOL.

To suggest that GOL is free to keep that money to do as it pleases is *actually contrary* to the "aims" and "context" of the critical vendor program. When Cox paid GOL $13 million, it obtained two things in return. First, it obtained GOL's agreement to serve as a critical vendor for the estate. Second, <u>it obtained a $13 million reduction in GOL's Prepetition Claim</u>. It is illogical to suggest that GOL is free to misappropriate that money for its own use, or that of its affiliates, instead of

using it to pay the vessel owners that provided the prepetition services. If GOL fails to pay the vessel owners that provided the underlying services, then the vessel owners who are still unpaid retain their claims against the Cox estate and Cox loses the second benefit of the critical vendor arrangement.

Finally, the very text of the Trade Agreement belies GOL's argument. The Trade Agreement contains precisely one reference to GOL's use of third-party vessel owners to provide services. It acknowledges that the vessels brokered by GOL are owned by third parties, defines those owners that provide post-petition services as "Third-Party Vessel Interests," and then explicitly states that "[t]he inability of 'Third-Party Vessel Interests' to provide services to GOL or the Debtors shall not be a default by GOL under this Trade Agreement," provided that GOL obtains vessels from alternative sources.[89] The inclusion of that single provision has several effects, none of which favor GOL's interpretation of the Trade Agreement.

Despite creating a defined term for "Third-Party Vessel Interests" the Trade Agreement does not use that term in the allocation provisions. That is, had GOL and Cox intended that the Trade Agreement payment be applied only to the Prepetition Claims attributable to "Third-Party Vessel Interests," they could have easily said that in the Trade Agreement. Instead, the Trade Agreement says only

[89] ROA.538.

that the payment must be applied to the Prepetition Claim, without any limitation based on the identity of the vessel owner that provided the underlying services.

Second, the Trade Agreement specifically contemplates that GOL may fulfill the terms of the Trade Agreement by brokering vessels owned by owners that provided no prepetition services to Cox. If Cox and GOL intended that GOL utilize the Trade Agreement payment to incentivize new vessel owners to provide services, then the Trade Agreement could have said that. Instead, the Trade Agreement says only that the payment must be applied to the Prepetition Claim, which necessarily precludes payment to a vessel owner whose services were not part of Prepetition Claim.

Lastly, the Trade Agreement explicitly contemplates that a Third-Party Vessel Interest might initially agree to provide post-petition services but later refuse to do so. Under GOL's proposed interpretation of the Trade Agreement, it would be prohibited from distributing any of the $13 million payment to such an owner or risk Cox clawing back the funds. But the Trade Agreement says precisely the opposite—that the failure of any Third-Party Vessel Interest to provide post-petition services *is not a breach of the Trade Agreement*. In other words, GOL is free to allocate the Trade Agreement payment to an entity that later refuses to provide post-petition services without risk of any consequences from Cox.

Related to that final point, GOL has argued that SEACOR refused to provide post-petition services to the estate, but there is no record evidence of that. In fact, in SEACOR's corporate deposition, SEACOR was asked whether it "pulled its vessels and stopped providing vessels in December of 2022."[90] SEACOR's representative's response was: "I don't think it's fair to say that we pulled the vessels. We just finished the jobs and did not provide additional vessels."[91] GOL creatively cited this testimony below to argue that SEACOR refused to provide services to Cox's estate but this is neither supported in the record nor dispositive.[92] Similarly, there is no evidence that GOL or Cox ever asked SEACOR to provide post-petition services, gave SEACOR an opportunity to participate in the critical vendor arrangement, or even told SEACOR that the arrangement existed. And for good reason—none of that ever happened. So, when GOL says that SEACOR "refused" to provide post-petition services to the estate, that is simply false. Rather, GOL never even offered SEACOR the opportunity—likely because GOL was engaged in wrongly diverting the Trade Agreement funds to itself and its affiliates.

---

[90] ROA.663.

[91] ROA.663.

[92] ROA.655 (citing ROA.663).

For all of these reasons, the District Court's holding that the Trade Agreement implicitly prohibited GOL from applying the Trade Agreement payment to SEACOR's invoices was error and should be reversed.

## III. GOL's Failure to Allocate the Trade Agreement Payment Breached its Fiduciary Duties to SEACOR

After wrongly concluding that the Trade Agreement prohibited GOL from allocating the Trade Agreement payment to SEACOR's invoices, the District Court alternatively held that SEACOR had not demonstrated that GOL was obligated to allocate the payment to SEACOR's invoices.[93] The District Court noted that SEACOR had presented evidence of a reasonable allocation that would have resulted in payment of most of SEACOR's invoices.[94] Nonetheless, the District Court erroneously concluded that SEACOR could not prove that GOL was *required* to allocate the payment in that manner.

This analysis misses the issue and ignores GOL's fiduciary obligations to SEACOR. This case is not a dispute over whether GOL allocated the Trade Agreement payment reasonably. As demonstrated above, GOL largely failed to allocate the payment at all—it simply kept the money for itself and its affiliates. So, this is not a dispute between two arguably reasonable allocations of the payment—

[93] ROA.975-976.

[94] ROA.975.

it is about GOL's total failure to do *any* allocation, despite its obvious contractual and fiduciary obligation to do so.

SEACOR directly pointed out this problem in its Motion for Reconsideration.[95] SEACOR further pointed out that it was difficult to imagine *any* allocation that did not result in GOL paying some portion of SEACOR's invoices.[96] In essence, GOL's argument and the District Court's analysis is that, because GOL failed to allocate the Trade Agreement payment to specific invoices (as it was required to do), SEACOR cannot prevail on its claims because no portion of the payment was allocated to SEACOR's invoices. This circular analysis effectively rewards GOL for its plain and obvious misconduct. Whatever the "aims" and "context" of the Bankruptcy Court's critical vendor arrangement, it is wholly illogical to suggest that GOL's perversion of the Trade Agreement is consistent with those aims and that context.

SEACOR explicitly asked the District Court to perform the allocation that GOL was required, but failed, to do.[97] In the alternative, SEACOR requested that the District Court withhold final judgment to allow SEACOR to seek a ruling from

[95] ROA.986.

[96] *See* ROA.993-995.

[97] ROA.995 ("[T]his Court can and should perform that allocation itself").

the Bankruptcy Court performing that allocation.[98] But the District Court denied the motion without even acknowledging SEACOR's allocation argument and request.[99]

GOL's failure to allocate the Trade Agreement payment to specific invoices is not only a breach of the Trade Agreement, but it is also a breach of GOL's fiduciary obligations to SEACOR. As relevant to SEACOR's claims in this case, GOL has two obligations under the Brokerage Agreement. First, it must "undertake all reasonable efforts to collect charter hire from [Cox]."[100] Second, when it receives payment on any of SEACOR's invoices, GOL must "remit net charter hire (charter hire less [GOL's] fee to [SEACOR] within fifteen (15) business days."[101]

The District Court's analysis focused almost entirely on the second obligation. It was error to ignore the first—an error, incidentally, not repeated by Judge Fallon in the R&R case. GOL's obligation to "undertake all reasonable efforts to collect charter hire from [Cox]" imposes a fiduciary obligation in SEACOR's favor.[102] Indeed, Judge Fallon interpreted identical language in the R&R agreement with GOL

---

[98] ROA.997.

[99] ROA.1054.

[100] ROA.278.

[101] ROA.278.

[102] ROA.278.

to impose fiduciary obligations on GOL. *R & R Boats*, 2026 WL 352786, at *5. He was correct to do so.

Because there is no separate maritime law of agency, this Court looks to the Restatement (Second) of Agency. *See Johnson v. GlobalSantaFe Offshore Servs., Inc.*, 799 F.3d 317, 322 (5th Cir. 2015).[103] The Restatement imposes a duty of care in favor of the principal, including a specific rule for agents engaged in collection activities: "Unless otherwise agreed, an agent employed to collect from others goods or money due the principal has a duty of using reasonable care and skill in making such collections in accordance with the directions of the principal." Restatement (Second) of Agency § 426 (1958). In addition, the Restatement addresses conflicts of interest: "If, without the violation of a duty on the part of an agent, a situation arises in which the principal's affairs conflict with those of the agent, the agent has a duty to deal fairly in the protection of the principal's interests." Restatement (Second) of Agency § 393, cmt. d (1958).

Finally, the Restatement recognizes a duty of loyalty owed by the agent to the principal. That is, "an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." Restatement (Second) of Agency § 387 (1958). An agent's "primary obligation imposed . . . by

[103] Because this Court has cited to the Restatement (Second) of Agency, even after the Restatement (Third) was published in 2006, SEACOR will cite to the Restatement (Second).

the fiduciary duty of loyalty is to avoid self-dealing with regard to the business of the principal. Accordingly, an agent may not take part in any transaction adverse to the interests of the principal without obtaining the principal's permission, after full disclosure of all facts that might affect the principal's decision." *United States v. State Farm Fire & Cas. Co.*, 2016 WL 3034326, at *9–10 (S.D. Miss. May 27, 2016); *see also Brown v. Slenker*, 220 F.3d 411, 424 (5th Cir. 2000) ("[I]t is well-settled that an agent is a fiduciary with respect to the matters within the scope of his agency.").

The District Court stated that GOL's sole agency obligation to SEACOR was to obtain charters and remit payments.[104] That is plainly wrong. GOL was also obliged to undertake "all reasonable efforts to collect charter hire from [Cox]."[105] This means that GOL owed SEACOR a fiduciary duty to use reasonable care in its collection efforts and, if a conflict of interest arose, to treat SEACOR fairly. Thus, when the District Court held that GOL had no obligation to allocate any portion of the Trade Agreement payment to SEACOR, that was inaccurate.

The Trade Agreement required GOL to apply the $13 million payment to the invoices comprising GOL's Prepetition Claim. GOL's fiduciary duties required it to treat SEACOR fairly in doing so. At a bare minimum, GOL was obligated not to

[104] ROA.979.

[105] ROA.278.

engage in self-dealing to SEACOR's detriment, which it plainly did. Recall that GOL's President Rec Chaddock was also the sole owner of Rec Marine, which received $7.8 million of the $13 million payment, $5 million of which was an undocumented loan with no known terms. It is difficult to imagine a plainer example of self-dealing and breach of fiduciary duty than GOL's conduct with respect to the Trade Agreement payment.

All SEACOR has ever asked is that the District Court do the allocation that GOL has steadfastly refused to do. Because both the Trade Agreement and basic principles of agency law require that such an allocation be done, and because GOL has refused to do it, this Court should remand this matter to the District Court so that the allocation can be performed and SEACOR's damages calculated.[106]

## IV. The R&R Verdict Further Underscores this Result

As detailed above, when faced with essentially identical claims, on the exact same factual record, Judge Fallon denied summary judgment and then ruled in favor of R&R after a bench trial. That a different district judge reached the opposite conclusion on the same set of facts leaves little doubt that the summary judgment ruling in this case should be reversed.

---

[106] Of course, after the District Court refused to perform any allocation, SEACOR took GOL up on its suggestion to present the allocation request to the Bankruptcy Court, only to have GOL argue that the Bankruptcy Court lacked jurisdiction to allocate the Trade Agreement Payment. This Court should put an end to GOL's jurisdictional antics and remand this matter to the District Court for an allocation to be performed.

Summary judgment is only appropriate where a reasonable factfinder could not reach a contrary result. *See Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 548 (5th Cir. 1987) (holding that, even in the presence of undisputed facts, "[i]f reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment"). In most appeals from a summary judgment, this Court must ask whether it believes that a reasonable factfinder could reach a contrary result. That is self-evident in this instance. Here, a reasonable factfinder (Judge Fallon) was presented with the same facts and law at trial on the merits and reached the opposite result. That only further bolsters the conclusion that SEACOR is, at a minimum, entitled to a trial on its claims.

## CONCLUSION

GOL was paid $13 million by Cox pursuant to a Trade Agreement that explicitly required GOL to apply the payment to the invoices comprising GOL's Prepetition Claim. Instead of allocating any of those funds to SEACOR's invoices (which totaled $2.7 million), GOL redirected most of the $13 million to itself and its commonly owned affiliates. GOL's brazen misappropriation of the Trade Agreement funds plainly violated GOL's fiduciary obligations to SEACOR.

The District Court excused GOL's misconduct by reading a new term into the Trade Agreement by implication that purportedly prohibited GOL from allocating any of the funds to SEACOR's invoices. But that new term was contrary to GOL's

contemporaneous understanding of the Trade Agreement, as evidenced by its behavior, the actual terms of that agreement, and the "aims" and "context" of the Bankruptcy Court's critical vendor program. That was error.

This Court should reverse the District Court's erroneous summary judgment ruling, hold that GOL violated its contractual and fiduciary obligations to SEACOR, and remand this matter for a trial on damages.

Respectfully submitted,

BY: *<u>/s/ Arthur R. Kraatz</u>*

Arthur R. Kraatz (Bar #35194)
Gary A. Hemphill (Bar #6768)
Jeremy T. Grabill (Bar #34924)
PHELPS DUNBAR LLP
Canal Place | 365 Canal Street, Suite 2000
New Orleans, Louisiana 70130
Telephone: 504 566 1311
Facsimile: 504 568 9130
Email: arthur.kraatz@phelps.com
gary.hemphill@phelps.com
jeremy.grabill@phelps.com

**ATTORNEYS FOR APPELLANT SEACOR MARINE, L.L.C.**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed on this 18th day of March, 2026, with the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system, which sent a notice of electronic filing to all participating counsel of record in this matter.

*/s/ Arthur R. Kraatz*
Arthur R. Kraatz
ATTORNEY FOR APPELLANT
SEACOR MARINE, L.L.C.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed R. App. P. 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), it contains 9,362 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally-spaced typeface, including serifs, using Word, in Times New Roman 14-point font, except for the footnotes, which are in proportionally-spaced typeface, including serifs, using Word in Times New Roman 12-point font.

Respectfully submitted,

BY: */s/ Arthur R. Kraatz*

Arthur R. Kraatz
ATTORNEY FOR APPELLANT
SEACOR MARINE, L.L.C.

Dated: March 18, 2026